SUPERIOR COURT 
 
 COMMONWEALTH vs. JOSE ARCE

 
 Docket:
 158ICR00221
 
 
 Dates:
 May 26, 2022
 
 
 Present:
 David A. Deakin
 
 
 County:
 Middlesex
 

 
 Keywords:
 MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR NEW TRIAL
 
 

       In October 2017, a jury convicted the defendant, Jose Arce, of raping a four-year-old female acquaintance in 2008. Arce was thirty-nine years old then. He has brought a Motion for New Trial ("Motion," Paper No. 145) based on the asserted ineffectiveness of his trial counsel, Austen C. Tzeng, who is not his current counsel. He advances three arguments as to why his counsel was ineffective. Because I conclude that Tzeng was ineffective for not consulting with, and possibly calling, an expert in child memory, the Motion is ALLOWED.

In allowing the Motion, I express no opinion as to Arce's guilt or innocence. Doing so is neither required to decide the Motion nor appropriate at this stage. In deciding a motion for new trial based on ineffective assistance of counsel, I must assess whether defense counsel's representation fell substantially below the standard expected of the ordinarily fallible lawyer and, if so, whether that inadequacy deprived the defendant of a viable avenue of defense.
      
I am aware that, in ordering a new trial, I may well, in effect, be requiring the now- almost-eighteen-year-old young woman whom Arce was convicted of raping as a young child to testify again. I am further aware that this is likely to be an extremely difficult experience. Cf. Commonwealth v. Hartfield, 474 Mass. 474,481 (2016) ("[W]e recognize the risk that an alleged

-1-

sexual assault victim might suffer trauma from having to testify at a probation violation hearing."). Cf. also Commonwealth v. Alvarez, 480 Mass. 299,319 (2018) (Lowy, J. concurring) (trauma for victims of sexual assault not limited to "having to testify about the crime committed"). I am also cognizant that not only the victim named in the indictment and her family but also the citizens of the Commonwealth have a substantial interest in the finality of Arce's conviction. See Commonwealth v. Gordon, 82 Mass. App. Ct. 389, 394 (2012) ("A strong policy of finality limits the grant of new trial motions to exceptional situations, and such motions should not be allowed lightly."), citing, inter alia, Commonwealth v. Lopez, 426 Mass. 657, 662-663 (1998).  See also Commonwealth v. Randolph, 438 Mass. 290,294 (2002) ("Although the public's interest in the finality of criminal convictions is weighty, it is not always paramount."). None of these entirely legitimate concerns, however, relieves me of the obligation to determine whether the defendant had the benefit of effective counsel in defending against these very serious charges and, if not, whether that deficiency deprived him of a substantial ground of defense.

FACTS

I. THE REPORT

On May 25, 2008, a then-four-year-old girl, Johana,[1] told her fourteen-year-old cousin, Demitri,[2] that "Jose" had kissed her on the mouth. Johana seemed "scared" and "nervous" as she spoke to her cousin. Apparently because Arce was regularly at the (extended) family home and because he was walking away from Johana when she approached Demitri, he concluded that she was referring to Arce. Demitri told his mother what Johana had said. His mother, in turn, called

--------------------------------------------

[1] A pseudonym.

[2] The parties are referred to by their first names to maintain Johana's confidentiality.

-2-

her mother, Johana's mother, and the police. A commotion arose when the police arrived at the home to investigate, and Arce eventually was arrested for disorderly conduct.

II. THE INVESTIGATION

The police commenced an investigation of Johana's disclosure, and, on August 22, 2008, a child interview specialist interviewed her about it. The interview was recorded. In it, Johana reported that "Manuel" had kissed her on the mouth and that it was "an accident." When asked about Manuel, Johana said that he was "a kid" with brown hair and brown skin. The only Manuel connected with the extended family and household was an eight-year-old boy. Johana did not mention the names "Jose" or "Arce" during the interview.
      
On September 18, 2008, Johana's mother met with Detective Carlos Mercado of the Lowell Police Department.[3] She explained to him that, because of Johana's age, she "didn't want anything to do with the case." Tr. VII, 23: 5-6. The police apparently ceased their investigation then.
      
In 2015, Johana was interviewed again about her report that Arce had raped her. The record does not reflect the circumstances that led to the second interview. In the 2015 interview, Johana gave a detailed account of the assault, identifying Arce as the perpetrator. The police then interviewed Arce, who acknowledged that, on a day in May 2008, he had been asked to check on Johana, who was watching television in the bedroom. He told police that he had checked on the girl several times. He told police that Johana was "three or four years old" at the time. Tr. VI, 121: 14-15. Detectives asked Arce whether he had kissed Johana or she had kissed him. Initially, he denied that there was a kiss. Later in the interview, however, Arce said that Johana had kissed

--------------------------------------------

[3] At trial, neither Johana's mother nor Detective Mercado recalled the precise date of this meeting. A Victim/Witness Statement Report prepared in connection with this meeting, however, is dated September 18, 2008. See Exhibit 7, Lowell, MA. Police Dept.: Victim/Witness Statement Report.

-3-

him but that the kiss had not been on the mouth. At another point in the interview, Arce was asked about Johana's report that "he had taken her by the arm into the bedroom." Tr. VI, 121: 16-19. When police asked Arce whether he had taken Johana by the arm during the incident, he responded by saying, "and I took her to the room." Tr. VI,122:1-4.

III. THE TRIAL

The Commonwealth called six witnesses: Johana's mother, Johana, Demitri, Yaritza (the godmother of Johana's brother), and Officer David Geoffrey and Detective Carlos Mercado, both of the Lowell Police Department. Arce called two witnesses: private investigator Sean Burke and Alicia Gurnski, a forensic interviewer with the Middlesex District Attorney's Office's Child Protection Unit.[4]
      
Near the beginning of his opening statement, defense counsel told the jury that the case was "about ... whether or not [Johana's] ... memory of the incident today actually occurred." Tr. V, 41: 18-19. He went on to lay out the reasons why the defense contended that Johana's memory should not be credited. Defense counsel concluded his opening statement with this:

I'm not an expert on memory. There's not going to be' any kind of expert testimony about memory in this case, but all I do know is this. What she's saying - what I anticipate that she's going to testify to you all today is dramatically different than what she said in 2008. Dramatically different. Different enough to give you all reasonable doubt that this assault did not occur [sic], could not have occurred in the manner that she currently believes it did.

Tr. V, 46: 9-18.

Johana testified at trial in 2017 and gave a detailed account of the assault. It was generally consistent with the substance of her 2015 interview. She testified that, on a day in May 2008, when she was four years old, she was in her grandmother's living room watching television with Demitri. Three women were in an adjacent bedroom. Arce came into the living

--------------------------------------------

[4] Ms. Gumski testified about her interview of Johana in 2008, when she was four years old.

-4-

room and asked Demitri to go outside, which he did. Johana then went to greet Arce with a kiss on the cheek. When she did, Arce turned her face so that she kissed him on the lips. She testified that Arce then pulled down her pants and underwear and positioned her on her stomach on a stool. He separated her buttocks and licked in between, around her anus. She testified that she next recalled being on her back on a bed with her pants and underwear off. Arce was in front of her, "humping" her. Tr. V, 89: 19-21. She described that Arce used his penis to "hump" her between her labia. Tr. V, 90: 5-25. Johana recalled feeling "shocked, frozen." Tr. V, 91:13-14. Johana did not recall how the incident ended, but she remembers "being in the living room after it happened." Tr. V, 92: 3-7. She remembered Arce using the computer. Johana identified Arce as the person who had assaulted her.
      
Johana testified that, the day after the assault, she told her godmother that Arce had kissed her. She explained that she had not reported the rest of the assault because she was "scared" that "what [she] ... was doing was wrong." Tr. V, 95: 4-5. She recalled that Arce was arrested the day that she disclosed the kiss. Johana testified that she had seen Arce once after his arrest, years later, when she was seven years old. On that occasion, she was with him for "[a] few seconds." Tr. V, 96: 5-7. When she testified, Johana did not remember having been interviewed in 2008, when she was four.
      
Demitri also testified. He recalled a day when he was fourteen years old and four-year- old Johana stopped him on his way back from the store. "She told ... [him that] Jose gave her a kiss "Tr. VI, 26: 4. Demitri "questioned" the girl. Tr. VI, 26: 5. When he asked her where on her body Jose had kissed her, she appeared "scared" and "just pointed to her lips." Tr. VI, 26: 6, 8. When Johana initially stopped Demitri, Jose Arce - whom Demitri also identified in court - was walking in the other direction. After questioning Johana, apparently quite briefly, Demitri

-5-

went inside and told his mother what Johana had told him. Demitri's mother telephoned the police.
      
Officer David Geoffrey of the Lowell Police Department testified about his response to the call on May 25, 2008. When he got to the street where Johana's family lived, Caddell Avenue in Lowell, he saw a group of people outside 26 Caddell Avenue, the family home. The group was pointing to Jose Arce, whom Officer Geoffrey identified in court. Officer Geoffrey recalled that

Arce was screaming yelling, running around. Screaming he didn't do anything ... Tr. V, 90: 6-7. Two other Lowell Police officials, Officer Paradise and Sergeant John Noon arrived shortly after Officer Geoffrey. The officers arrested Arce, and he eventually calmed down somewhat.
      
Also testifying was Detective Carlos Mercado, a veteran of the Lowell Police Department. He became involved in the investigation of this case in 2015, apparently as a result of Johana' s second forensic interview. Detective Mercado testified primarily to his interview of Arce in 2015. He began by recounting preliminary matters, including having provided the defendant with a Miranda advisory. Arce told Detective Mercado that, although he had never lived in the home in Lowell where Johana was living at the time of the assault, he "hung out there." Tr. V, 117: 6. Detective Mercado further testified that Arce recalled a day when he was at the home and was asked by Johana's maternal aunt to "check on" her. Tr. V, 119: 2-3. He recalled that she "was around three or four years old" at the time. Tr. V, 121: 15.
      
Arce told Detective Mercado that, apparently on the day in question, he had been playing video games in the living room, and Johana had been watching television on a large screen in a bedroom. Arce told Detective Mercado that he had periodically gotten up from his seat in the

-6-

living room to check on the girl. A second Lowell detective involved in the interview, Michael Marshall, asked Arce whether Johana had kissed him or he had kissed her. Initially, Arce denied that there had been a kiss. Later in the interview, Arce said that Johana had kissed him but that she had never kissed him on the mouth. Apparently after that concession, the detectives told him that Johana had reported that he had taken "her by the arm." Tr. V, 122: 3. Before the detective could finish the question, Arce interjected, "and I took her to the room." Tr. V, 122: 4. This was the same information that Johana had provided. Arce did not acknowledge any sexual contact with Johana.

Near the end of his closing, defense counsel repeated a theme from his opening:

Human memory is subject to fallibility, and that applies to all of us. I'm not an expert in any of this, and there is no expert testimony that you heard today. Just bring your common sense to that, that, you know, over time[,] our memories can change. We may not like to believe that that's the case, but also think about the ages that [Johana] ... has gone through, from 4 years old to 13 years old. Her life now is drastically different than it was then.

Now, I can't tell you why she remembers it this way, nor is it my burden to. But her current memory of what happened at that time is different, and it's wrong.

Tr. V, 86: 10-23.

Near the beginning of her closing, the prosecutor responded that "that day became a day that [Johana] ... would never forget." Tr. VII, 92: 16-17. The prosecutor then recounted the assault in vivid detail. Tr. VII, 92: 18 - 93: 25. In her peroration, the prosecutor returned to the issue of Johana's memory:

This isn't something that popped or miraculously appeared in [Johana's] ... head. Think about the detail, the things that she described, the ways that she said she was touched by the defendant. She remembers the detail of the trauma, of the things the defendant did to her, and she remembers each and every one of those details because it all happened to her. And she remembers because it's something she thought about all of the time for the last nine years.

Tr. VII, 100:18-101: 2.

-7-

PROCEDURAL HISTORY

The indictment in this case was returned on June 3, 2015. Jury empanelment began on September 26, 2017, and presentation of evidence began on October 3, 2017. Evidence concluded on October 5, 2017, and the jury returned its verdict that day. Arce was convicted of two counts of rape of a child with force (in violation of G. L. c. 265, § 22A) and three counts of indecent assault and battery on a child under fourteen years of age (in violation of G. L. c. 265, § 13B). On October 18, 2017, the Commonwealth entered a nolle prosequi as to a third charge of rape of a child with force. The court (Henry, J.) imposed sentence on October 23, 2017. The defendant was sentenced to concurrent fifteen-year state prison sentences on the rape convictions and concurrent five-year probationary sentences on the convictions for indecent assault and battery.
      
Arce filed this Motion on March 29, 2021, and, after receiving an extension of the deadline to respond, the Commonwealth filed its Opposition on June 16, 2021. A hearing was held on the Motion on January 24, 2022.[5] In addition to Dr. Price's testimony, the defendant introduced eight exhibits: (1) a compact disc ("CD") containing the trial transcript; (2) Dr. Price's curriculum vitae ("CV"); (3) Dr. Price's report in this case; (4) the transcript of Johana's 2008 interview; (5) the transcript of Johana's 2015 interview; (6) the Affidavit of Trial Counsel; (7) a Lowell Police Department Witness Statement dated September 18, 2008; and (8) a Lowell Police Department Arrest Report dated May 25, 2008. After an initial hearing on January 24,

--------------------------------------------

[5] Ordinarily a motion for new trial is heard by the judge who presided at the trial. See Commonwealth v. Richards, 485 Mass. 896,911 (2020) ("Under Mass. R. Crim. P. 30(b) ... , a motion for a new trial is ordinarily decided by the trial judge . . . ")Because that judge has retired in the interim, I was assigned to hear and decide the motion. See id. ("Where, as here, the trial judge had retired from the bench, the regional administrative justice refers the motion for a new trial to another judge for decision."), citing Rule 61A(B) of the Rules of the Superior Court (2020).

-8-

2022, each of the exhibits except Exhibit 2 (Dr. Price's CV) was impounded because they contained Johana's true name and/or identifying information about her. I took the Motion under advisement after allowing the parties to submit limited post-hearing memoranda no later than January 28, 2022. On January 28, 2022, the defendant filed a Supplemental Memorandum in Support of the Motion for New Trial (Paper No. 163). The Commonwealth responded with a Supplemental Memorandum in Opposition to Defendant's Motion for New Trial (Paper No. 165). The defendant then filed Defendant's Response to the Commonwealth's Supplemental Memorandum of Law (Paper No. 166).

IV. THE TESTIMONY OF HEATHER PRICE, PH.D., IN SUPPORT OF THE MOTION FOR NEW TRIAL

In support of his Motion for New Trial, the defendant called Heather Price, Ph.D.[6] She testified remotely by Zoom, an internet teleconferencing application. Dr. Price is a professor at Thompson Rivers University in Kamloops, British Columbia; she holds the Canada Research Chair in Culture and Communities: Children and the Law. She is an expert in memory and, in particular, childhood memory. She has published extensively in the field. The defendant called her to testify about how memory works, with specific emphasis on children's memories. Dr. Price testified that she has been hired as an expert by defendants in criminal cases in approximately twenty to thirty cases. In two or three of those cases, she prepared formal reports. Although she has been qualified once as an expert - in a court in Ontario - she has never previously testified as an expert. Dr. Price also explained that she has worked extensively with law enforcement officials in British Columbia. In this capacity, she has served both as a

--------------------------------------------

[6] Dr. Price has taught and published widely in psychology, as set out in her curriculum vitae ("CV"), which was introduced as Exhibit 2 at the hearing on Arce's Motion for New Trial.

-9-

consultant on individual interviews with children and as a trainer. Her training work with law enforcement has focused primarily on teaching the most up-to-date approaches to interviewing child victims of alleged abuse. I found Dr. Price's testimony clear, cogent, and persuasive, and I therefore credit it. The Commonwealth did not call an expert.[7]
      
Dr. Price testified that, in preparation for her appearance, she reviewed several documents related to the investigation and trial. She also testified to her familiarity with the scientific literature in the field of childhood memory.
      
Dr. Price testified that forming and recalling a memory involves three stages: encoding, storage, and retrieval. At each stage, she explained, there is the potential for error. Dr. Price noted that many factors affect the accuracy of memories. These include: what the person forming the memory is thinking about at the time the memory is formed, what the person is paying attention to, the person's prior knowledge about the type of event encoded (context), and the presence of distractions. Any of these factors can, and often do, affect the accuracy of a memory. Errors occur in the memory storage stage primarily due to "trimming." This is the scientific name for the common understanding that one's memory cannot store everything that one has experienced. Thus, the mind limits what it stores about each memory. Finally, errors in the retrieval stage can be caused by many factors, including: the way in which a person is questioned, the attention that the person pays to retrieving the memory, and the individual's experiences since the memory was formed.
      
Dr. Price further explained that, over time, thinking about an event can lead to contamination of the memory. In this process, events in one's life can infiltrate one's memory of

--------------------------------------------

[7] The Commonwealth notified the court that it might call an .expert, Stephanie Block, Ph.D. Indeed, like Dr. Price, Dr. Block attended the hearing in this matter via Zoom. After Dr. Price's testimony, the Commonwealth requested time to consult with Dr. Block before cross-examining Dr. Price, which was allowed.

-10-

an earlier event. This contamination can result from both internal and external forces. A common example of internal contamination, according to Dr. Price, is thinking about how one wishes one had acted in a given situation. This type of reflection can, over time, influence one's memory of how one actually acted. An example of an external source of contamination is suggestive questioning by others. Another common source of external contamination is information that an individual receives from the culture, including entertainment and media sources. Thus, a person who watches news and/or fictional accounts of police interactions can come to develop preconceptions about how such interactions typically unfold. Over time, this can contaminate the person's memory of how a particular interaction with police unfolded in that person's life.
      
Dr. Price also testified about sources of possible error in the retrieval of memory. She made the now-familiar point that memory does not work like a video recorder.[8] Rather, when memories are encoded, fragments of the memory - including audio information, visual information, and contextual or experiential information - are stored across several sectors of the brain. When a person seeks to recall an event, the brain must pull these fragments together from across those locations. Sometimes, Dr. Price testified, the brain brings together fragments associated with the memory that are not part of the originally encoded memory.
      
Dr. Price testified that errors in the encoding, storage, and retrieval of memories are common in all persons. They are particularly prominent, however, in younger children. This is because children are less neurologically mature than adults and are, therefore, more susceptible than adults to social influences. Children are also less able than adults to monitor the sources of

--------------------------------------------

[8] See Commonwealth v. Gomes, 470 Mass. 352,366 (2015) ("Human memory does not function like a video recording but is a complex process that consists of three stages: acquisition, retention, and retrieval.")

-11-

information they receive and accurately attribute the information to the correct source. Thus, according to Dr. Price, they are more likely than adults - on average - to misattribute memories.
      
Dr. Price testified that she had reviewed, and was familiar with, thousands of studies on children's memories. Many of these studies have shown that people - both children and adults - can come to believe that things happened to them that, in fact, did not. Studies show that this is a surprisingly common phenomenon. As an example, Dr. Price explained a study in which seventy percent of college students surveyed reported having seen on September 11, 2001, live video footage of the first plane crashing into one of the World Trade Center's towers. They reported this despite that there was no live video coverage of that event on the day of the attack. Dr. Price testified that many studies have replicated this contamination effect. For example, a study of children showed that a significant number of young children were persuaded to recall a ride in a hot-air balloon that their parents confirmed they had never taken.
      
Dr. Price explained that incorporating inaccurate memories can be "adaptive." This is because doing so helps people plan for the future. According to Dr. Price, human beings want to remember bad things - including traumatic events - to prepare against them in the future. This, in turn, can contribute to survival. Thus, even inaccurate memories can play a beneficial role in protecting individuals from harm.
      
Dr. Price explained that every time a person attempts to remember something, there is a reconstructive process. Thus, each attempt to recall a memory presents opportunities for contamination. She further explained that "memories are never complete." The shorter the window between encoding and retrieval, however, the less opportunity there is for contamination. This merely describes in scientific terms the common experience that even vivid

-12-

memories fade over time. Vivid memories, Dr. Price explained, often feature a few core memories that are remembered well, but even vivid memories are susceptible to contamination.
      
Dr. Price also testified about the phenomenon of"trivial persuasion." She explained that there is a widely held intuition that the more detailed a person's account of an event is, the more likely it is to be accurate. Dr. Price further noted that studies have shown that there is no correlation between the level of detail in a recalled account and its accuracy. Indeed, Dr. Price pointed out that some studies have shown a negative correlation - meaning that, at least at a certain point, greater detail in a memory indicates diminished reliability. Dr. Price's report and testimony make clear that there are several factors that likely affect the level of correlation. Among them, certainly, are the age that the reporter was at the time the recalled event occurred and the passage of time between then and the recollection.
      
Dr. Price testified that, as of 2017 - and, indeed, much earlier - the subjects of her testimony were both well known to, and generally accepted by, academic researchers studying memory and, in particular, childhood memory.

ANALYSIS

The defendant has moved for a new trial pursuant to Mass. R. Crim. P. 30(b). Under the rule, a judge may grant a motion for new trial "if it appears that justice may not have been done." Commonwealth v. Lessieur, 488 Mass. 620,627 (2021), quoting Mass. R. Crim. P. 30(b), 435 Mass. 1501 (2001). As the defendant has a right to counsel under the Sixth Amendment to the United States Constitution and Article 12 of the Massachusetts Declaration of Rights, see Commonwealth v. Marinho, 464 Mass. 115, 124 n.11 (2013) ("[W]e grant more expansive protections under [art. 12 ... ] than have been required of States under the Sixth Amendment"), quoting Commonwealth v. Rainwater, 425 Mass, 540,553 (1997), cert. denied, 522 U.S. 1095

-13-

(1988),justice is not done if his counsel is ineffective. See Commonwealth v. Gordon, 82 Mass. App; Ct. 389,394 (2012), citing Commonwealth v. Hiskin, 68 Mass. App. Ct. 633, 637-638 (2007).

"To prevail [on a motion for new trial based] on a claim of ineffective assistance of counsel, 'the defendant must show that the behavior of counsel fell measurably below that of an ordinary, fallible lawyer and that such failing "likely deprived the defendant of an otherwise available, substantial ground of defense."'" Commonwealth v. Sanchez, 100 Mass. App. Ct. 644, 647-648 (2022), quoting Commonwealth v. Prado, 94 Mass. App. Ct. 253,255 (2018), quoting Commonwealth v. Saferian, 366 Mass. 89, 96 (1974). A ground of defense is substantial if the court has "a serious doubt whether the jury verdict would have been the same had the defense been presented." Commonwealth v. Millien, 474 Mass. 417,432 (2016). A defense attorney's strategic choice constitutes ineffective assistance of counsel only if "the decision was manifestly unreasonable when made." Commonwealth v. Epps, 474 Mass. 743, 757 (2016), quoting Commonwealth v. LaBrie, 473 Mass. 754,771 (2016). The defendant bears the burden of establishing that his trial counsel was ineffective. Marinho, 464 Mass. at 115, citing Commonwealth v. Watson, 455 Mass. 246, 256 (2009). "Judges are to apply the standard set forth in rule 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth." Commonwealth v. Wheeler, 52 Mass. App. Ct. 631, 635-636 (2001), citing, inter alia, Commonwealth v. Fanelli, 412 Mass. 497, 504 (1992). Because Arce has met this burden, I am constrained to allow his Motion.

-14-

I. THE FAILURE TO CONSULT WITH AN EXPERT IN CHILDHOOD MEMORY

The defense in this case involved two major claims. The first was that, because of contradictions among Johana's statements to her cousin Demitri in May 2008 (when she was four years old), in her August 2008 interview, in her 2015 interview, and in her trial testimony, the jury could not conclude beyond a reasonable doubt that her account at trial was accurate. The second component of the defense centered on the absence of corroborating evidence, which trial counsel laid largely at the feet of the police, whose investigation, trial counsel maintained, was deficient. The primary inconsistencies in Johana' s several statements highlighted by the defense were the disparity between her initial statement to Demitri that "Jose" had kissed her and her statement in the interview three months later that Manuel, "a kid," had kissed her and the contradiction between her initial statement that "Jose" had kissed her and her descriptions of much more extensive sexual abuse in her 2015 interview and trial testimony. The defense also pointed to several less-central discrepancies.
      
In his Motion, Arce argues that, in light of that defense, it was ineffective of his trial counsel not to call, or even consult with, an expert in childhood memory. At the heart of Arce's Motion is the rationale of Commonwealth v. Gomes, 470 Mass. 352,369 (2015), a case about eyewitness identification. In Gomes, the Supreme Judicial Court observed that "research makes clear that common sense is not enough to accurately discern the reliable eyewitness identification from the unreliable, because many of the results of the research are not commonly known, and some are counterintuitive." 470 Mass. at 366, citing State v. Guilbert, 366 Conn. 218, 234-235 (2012). One of the counterintuitive aspects of eyewitness identification identified by the Gomes

-15-

court was the principle that "[h]uman memory does not function like a video recording but is a complex process that consists of three stages: acquisition, retention, and retrieval."[9] Id
      
Arce maintains that, like the science surrounding eyewitness identification and its limitations, the science pertaining to human memory - particularly childhood memory - is sufficiently counter-intuitive that, in cases such as this, in which the accuracy of a child's memory is at the heart of the case, expert testimony is necessary to dispel commonly held misconceptions. The core of this claim is that, just as in the context of eyewitness identification, "a substantial number of jurors come to each trial with basic misunderstandings about the way memory works in general ...."Id at 366 n.22, quoting Schmechel, O'Toole, Easterly, & Loftus, Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence, 46 Jurimetrics 177, 204 (2006).[10]

--------------------------------------------

[9] In her testimony, Dr. Price labeled the three stages of memory as "encoding, storage, and retrieval." It appears from her testimony, however, that "encoding" is at least roughly a synonym for "acquisition," and "retention" is similarly synonymous with "storage." At least generally, Dr. Price's testimony paralleled-while expanding significantly - on the analysis in Commonwealth v. Gomes, 470 Mass. 352,369 (2015).

[10] Arce suggests two primary ways in which the testimony of an expert in childhood memory could have weakened the Commonwealth's case. First, he contends that it could have provided a scientific framework to undermine the Commonwealth's claim that Johana's memory was demonstrably strong and, therefore, reliable. This claim is addressed in the text. Second, he contends that expert testimony might have persuaded the trial judge not to permit Johana to identify him in court. Failing that, Arce maintains, it might have caused the jury to question whether he was, in fact, the person about whom Johana was testifying. In this context, Arce notes that, generally, in-court identifications - because of their inherent suggestiveness - are not permitted unless the witness previously identified the defendant unequivocally in a non- suggestive, out-of-court identification procedure. See Commonwealth v. Crayton, 470 Mass. 228, 237 (2014). As Arce concedes, there is an exception to this general rule if the Commonwealth has "good reason" to justify an in-court identification without a prior out-of-court identification. See id at 241. The most common such situation involves a witness who is familiar with the defendant. See id. at 242. Arce contends that the record makes clear that Johana was insufficiently familiar with him to justify permitting her to identify him in court. In light of my resolution of the Motion, I need not determine whether Johana was properly allowed to make an in-court identification. Arce argues additionally that, even if Johana properly was allowed to

-16-

Arce emphasizes, in particular, Dr. Price's testimony about the concept of"trivial persuasion." This is the widely held belief - not supported by the research, particularly into childhood memory -that the more detailed a person's account of an event is, the more likely it is to be accurate. Because studies have shown that the common intuition is unsupported by the research - and, indeed, even called into question by several studies - Arce contends that it was ineffective of his counsel not to bring that research to the jury's attention.

A. THE ROLE OF MEMORY IN THE PROSECUTION'S THEORY OF THE CASE

      The counter-intuitive notion underlying the concept of trivial persuasion comes to the fore in this case because, in her closing, the prosecutor understandably encouraged the jury to credit Johana' s account in significant part because of its level of detail. The day of the assault was, in the prosecutor's formulation, "a day that [Johana] ... would never forget." Tr. VII, 92: 16-17. The prosecutor returned to the theme near the end of her argument when she urged the jury to 

[t]hink about the detail, the things that she described, the ways that she said she was touched by the defendant. She remembers the detail of the trauma, of the things the defendant did to her, and she remembers each and every one of those details because it all happened to her. And she remembers because it's something she thought about all of the time for the last nine years.

Tr. VII, 100:18- 101: 2. Thus, the Commonwealth's case placed substantial weight on the argument that recollection of a significant number of material details indicated that Johana's memory and testimony were accurate.

--------------------------------------------

identify him in court, expert testimony on childhood memory would have undermined the reliability of that identification. Although this is almost certainly true, at least to some degree, I am not persuaded that, standing alone, it could be the basis for a successful motion for new trial. This is because Arce, in his statement to police, acknowledged that Johana kissed him on the day in question and that he took her into another room. In light of that testimony, it is unlikely that a jury would have doubted Johana's identification of Arce as the person involved in the incident.

-17-

To support its position on this issue, the Commonwealth cites the Appeals Court's holding in Commonwealth v. Savage, 51 Mass. App. Ct 500 (2001). The Commonwealth argues that the Appeals Court in Savage expressly endorsed an argument virtually identical to the Commonwealth's in this case. Although this is an accurate reading of Savage, it does not take into account the context in which the Savage Court made its observation. Further, there is no evidence in Savage that the defendant raised the claim that Arce raises in this case.
     
In Savage, also a child sexual abuse case, the defendant argued, unsuccessfully; "that his counsel was ineffective in not pursuing other incidents of abuse, predating the defendant's· contact with the victim, which could have explained the victim's precocious familiarity with particular sexual terms and acts." Savage, 51 Mass. App. Ct. at 503, citing Commonwealth v. Ruffen, 399 Mass. 811, 816 (1987). It was in this context that the Savage Court noted that the victim's testimony was "replete with specific details of a nonsexual nature . . . "Id. at 504. These details, the Savage Court reasoned "tended to demonstrate that [the victim] . . . was not drawing upon previous incidents." Id., citing Commonwealth v. Rathburn, 26 Mass. App. Ct. 699, 708 (1988).
      
In this case, there was no allegation that Johana had been sexually abused before the charged assault and therefore no need to demonstrate that she had not conflated the incident with Arce with one or more other incidents. More fundamental, there does not appear to have been a challenge in Savage to the Commonwealth's claim that the presence of large numbers of details indicated that the childhood memory was reliable. Savage, therefore, in no way suggests that it is not open to defendants to challenge the purportedly common-sense view that the more detailed a memory, the more likely it is to be accurate.

-18

In addition to the phenomenon of trivial persuasion, Arce points to the ways in which, over time, memories can be contaminated by both internal reflection and external input. Dr. Price explained that, as people recall events over time, their recollection of them can be influenced by the process of recollection itself. Dr. Price provided the example of a person recalling an event and reflecting on what the person might or should have done differently. Over time, Dr. Price explained, the memory can be altered by these internal musings. Similarly, as individuals recall events, they can be influenced by external factors. So, for example, a person's memory of an interaction with police can be re-shaped, over time, by media depictions of other peoples' interactions with police, both actual and fictional. Dr. Price further testified that this effect is more profound for children under twelve years old, who are more suggestible than persons over the age of twelve.
      
Dr. Price further testified that, because young children are both cognitively and neurologically immature, their ability to encode, store, and recall information is less developed than those of adolescents and adults. She explained that, in order to encode a memory, a person must be able to understand what is happening. Because young children do not have the same comprehension of events as older children and adults, their ability to encode and retrieve memories is significantly less developed than that of older persons.

B. THE ROLE OF MEMORY IN DEFENSE COUNSEL'S THEORY OF THE CASE

Near the beginning of his opening statement, defense counsel told the jury that the case was "about ... whether or not [Johana's] ...  memory of the incident today actually occurred." Tr. V, 41: 18-19. He went on to lay out the reasons why the defense contended that Johana's memory should not be credited. Defense counsel concluded his opening statement by conceding that he is "not an expert on memory" and that, "[t]here's not going to be any kind of expert

-19-

testimony about memory in this case." Tr. V, 46: 9-18. In his closing, he returned to the issue, identifying the case's central question as, "whether or not [Johana] ... in 2017 is accurately recalling what she believes happened." Tr. VII, 73: 10-12. Near the end of his closing, he reiterated that he is "not an expert in any of this, and there is no expert testimony that you heard today." Tr. VII, 86: 11-13. He then urged the jurors to, "[j]ust bring [their] ... common sense to" the question of the reliability of Johana's memory. Tr. VII, 86: 13.
      
Arce's contention is that there was no reasonable basis for his trial counsel's decision not call, or even consult, an expert on childhood memory. Absent such a reason, Arce continues, it cannot have been a reasonable tactical decision on his counsel's part not to call - or even consult - an expert on childhood memory. This is especially so, Arce contends, because the rationale of Gomes strongly suggests that expert testimony is necessary in most, if not all, cases in which the defense focuses on the reliability of a childhood memory.
      
The record supports the conclusion that trial counsel's decision not to call an expert was, in fact, a tactical or strategic one. The only remaining issue, therefore, is whether it was manifestly unreasonable when made. I conclude - based on the record and applicable caselaw - that counsel's decision was manifestly unreasonable. There are two reasons for this.
      
First, it is difficult to see how an expert's concession that Johana could be recalling the assault accurately could have weakened the defense's position significantly. There is every reason to believe that, had defense counsel consulted an expert in childhood memory, that expert would have provided testimony similar to Dr. Price's. This assumption is warranted because Dr. Price explained that everything she testified to at the hearing was generally accepted in the psychological community in 2017. Moreover, although the Commonwealth had consulted with

-20-

an expert, Dr. Stephanie Block, to prepare for the hearing and again after Dr. Block heard Dr. Price's testimony, the Commonwealth did not call an expert to contradict Dr. Prices testimony.
      
Although Dr. Price, herself, conceded that Johana' s testimony might, in fact, be accurate, the grounds that she raised to be skeptical about that possibility likely would have bolstered defense counsel's argument to the jury that they, too, should have doubts. Calling an expert would have done at least two things for the defense. It could have explained to the jury aspects of childhood memory - and, in particular, recollection -  that are counter-intuitive. These include the ways in which a person's memory can shift over time without the person being aware of it and the phenomenon of trivial persuasion. Second, it would have allowed trial counsel to ground his argument in social science by pointing to the psychological bases for questioning the accuracy of a detailed memory for an event that occurred when a child was four years old. Weighed against these benefits, it was manifestly unreasonable for trial counsel to conclude that the likelihood that an expert would have to concede that Johana's memory might, in fact, be accurate justified not calling the expert.
      
In this context, the portions of trial counsel's opening statement and closing arguments cited above are particularly troubling. At the literal level, it is unclear whether they represent efforts to persuade jurors that they did not need expert testimony to understand the fallibility of childhood memory or, instead, an appeal to the jury not to hold the absence of expert testimony against the defendant. In either case, such an effort would be a reasonable tactical choice only if the decision not to call an expert were, itself, a reasonable choice. In the context of this case, however, there exists the real possibility that trial counsel's efforts in this regard actually conveyed a much less favorable impression to the jury - that counsel was unable to locate an expert whose testimony would be favorable. This, of course, is not the case, as Dr. Price's

-21

testimony establishes. That trial counsel twice - both in his opening statement and closing argument - remarked that the jury had not heard from an expert, however, might well have caused the jury to wonder why not. One plausible, though incorrect, explanation would be that counsel had been unable to locate one whose testimony would help the case. Reading the transcript, it seems to me likely that counsel realized - at some point before he gave his opening - that he should have called, or, at a minimum, consulted, an expert. That his opening statement and closing argument could have been heard by the jury to be a concession along these lines or, worse, viewed as a concession that he could not find an expert with favorable testimony to give reinforces my concern that better work by trial counsel might have yielded a different outcome.
      
There is a second reason to conclude that trial counsel's decision not to consult with, and likely call, an expert in childhood memory was unreasonable. The record reflects that, despite a suggestion by a professor of psychology at Tufts University that he consult an expert in child memory, defense counsel chose not to. Thus, the deference typically due to a defense counsel's decision to forego a defense is not appropriate here. If a trial attorney makes a "strategic decision ... after conducting a complete investigation of the possible defense, [courts] ... give deference to defense counsel's decision and determine whether it was manifestly unreasonable for counsel to forgo that defense based on the information available to counsel at the relevant time." Epps, 474 Mass. at 757, citing Commonwealth v. Holliday, 450 Mass. 794, 807, cert. denied, 555 U.S. 947 (2008) and Commonwealth v. Candelario, 446 Mass. 847, 854-858 (2006). If, however, counsel makes "a strategic decision ... to conduct something less than a complete investigation of a potentially substantial defense, either because defense counsel decided to forgo that defense or to present it at trial without complete investigation, [courts] ... ask whether it was manifestly

-22-

unreasonable to conduct so limited an investigation." Id., citing LaBrie, 473 Mass. at 771, quoting Commonwealth v. Lang, 473 Mass. 1, 14 (2015).
      
In this case, defense counsel did not explore the potential benefits - and costs - of calling an expert in childhood memory. He could not, therefore, have made an informed decision about whether such an expert's anticipated concession that Johana's memory might be accurate would so undermine the rest of the expert's testimony regarding the limitations of childhood memory as to render the testimony a net negative. Defense counsel, in his affidavit, avers that he "hired and consulted with Dr. Ayana Thomas, Professor of Psychology at Tufts University, about Mr. Arce's case." Aff. at p. 1, ¶ 3.[11] Dr. Thomas suggested

that it might be helpful to consult with a developmental psychologist who specializes in young children. Such an expert could assist with answering "what can a 4-year-old encode and remember."

Id at p. 1, ¶ 4. Presumably, Dr. Thomas was suggesting that counsel consult with someone like Dr. Price. Dr. Thomas also cautioned, however, "that it was possible that such an expert might turn out to be more 'beneficial to the prosecution."' Id. at p. 1, ¶ 5. Defense counsel did not consult with an expert in childhood memory, out of his concern for the possibility that the expert would have to concede the possibility that Johana's memory was accurate. Without such consultation, however, there was no sound basis for defense counsel to weigh that concern against the potential benefits of such expert testimony. Having heard Dr. Price's testimony, I am persuaded that defense counsel would have struck the balance differently had he heard it, or some facsimile of it. In any event, defense counsel's decision not to consult an expert out of

--------------------------------------------

[11] References to the Affidavit of Trial Counsel, which was introduced as Exhibit 6 at the hearing, are denoted by the abbreviation, "Aff.," followed by page and paragraph citations. References to the Commonwealth's Opposition to Defendant's Motion for New Trial ("Opposition," Paper No. 150), are denoted by the abbreviation, "Opp.," followed by a page citation.

-23-

concern for what that expert might say about one aspect of a much broader issue was, under the circumstances of this case, manifestly unreasonable.
      
The Commonwealth responds to this concern in several ways. First, it contends that Arce has not met his burden of proving that the outcome of the trial would have been different had his counsel called an expert "because the victim's testimony was sufficient to prove the defendant's guilt even if memories degrade over time." Opp. at pp. 7-8. The Commonwealth is clearly correct in asserting that Johana's testimony was sufficient to convict Arce. That the testimony was sufficient for conviction, however, does not establish that the outcome of the trial would have been the same had defense counsel called an expert in childhood memory. At the hearing, the Commonwealth bolstered this argument by predicting that, had defense counsel called such an expert, the Commonwealth would have called an expert to counter the defense expert's testimony. The case then would have become, to paraphrase Commonwealth's counsel, a battle of experts. From this, the Commonwealth urges the conclusion that calling an expert in childhood memory would have accomplished nothing of substance for Arce.
      
This argument is unpersuasive, however, because there is a very real possibility that even a so-called battle of experts would have provided the defense with a much stronger version of its argument to the jury to be skeptical of Johana's memory. Had a witness qualified as an expert in childhood memory provided the jury with bases in psychology to be skeptical of Johana's testimony, it might well have shifted the jury's perception of the case. Although Arce bears the burden of establishing that a new trial is warranted, his presentation of the Motion leaves "a serious doubt whether the jury verdict would have been the same had the defense been presented." Millien, 474 Mass. at 432. This is not to say, of course, that the verdict would have been different had Arce called an expert in childhood memory. It is certainly possible that had

-24-

defense counsel done so, the jury would have found Johana so credible - and the Commonwealth's case strong enough- as to warrant dismissing the expert's concern. In this case, however, in which the evidence is not overwhelming - and, indeed, the Commonwealth does not contend that it was - I am left with a real doubt as to whether the verdict would have been the same had the defense called an expert in childhood memory.
      
The Commonwealth further contends that such a doubt is unwarranted because of the strength of its case. It points, in particular, to Arce's statement to the police. In that statement, Arce said two things that the Commonwealth argues, correctly, were corroborative of Johana's testimony. First, he acknowledged that, on the date in question, Johana had kissed him, although he denied that the kiss had been on the mouth. Second, when asked by detectives whether he had taken Johana by the arm, he replied, unprompted, that he had taken "her into the room." Tr. VI, 122: 4. There is no question that the evidence of Arce's statements corroborated Johana's testimony significantly. It is likely that this corroboration contributed substantially to Arce's conviction. That said, it does not, alone or in combination with the other trial evidence, establish an overwhelming case for his guilt such that I am left with little or no doubt that the verdict would have been the same had the defense called an expert on child memory.

C. THE COMMONWEALTH'S RELIANCE ON COMMONWEALTH V. ANDRADE AND COMMONWEALTH V. AGUIAR

In support of its opposition, the Commonwealth cites Commonwealth v. Andrade, 98 Mass. App. Ct. 395, review denied, 486 Mass. 1109 (2020) and Commonwealth v. Aguilar, 92 Mass. App. Ct. 1126, *2 (2018) (Rule 128 opinion) (Aguiar III). In Andrade, the Appeals Court held that defense counsel's tactical decision not to call an expert on childhood memory and the effects of suggestibility on memory was not manifestly unreasonable. 98 Mass. App. Ct. at 399- 400. The Court in that case credited defense counsel's representations - in an affidavit that she

-25-

submitted in connection with the motion for new trial - that she: (1) had considered retaining such an expert, (2) had read articles on suggestibility and its effects on childhood memory, (3) had concluded that she was competent to cross-examine on the issue, and (4) that jurors could understand it without an expert. See id. at 399. Further, defense counsel in Andrade feared that, by being required to disclose the identity of her expert months before trial, she would alert the Commonwealth that the defense was based on suggestibility, thereby giving "the Commonwealth many months to prepare its witnesses for her cross-examination." Id. The Andrade Court observed that "an expert [on suggestibility and childhood memory] might well have been useful to the defense." Id. It went on to hold, however, that "we cannot conclude that the determination by trial counsel, that the cost of giving the Commonwealth notice of her intent to call such an expert would outweigh the benefits of the expert's testimony in this case, was manifestly unreasonable." Id.
      
The Commonwealth contends that, as in Andrade, defense counsel's decision in this case not to call an expert in childhood memory was a tactical choice - and one that cannot be characterized as "manifestly unreasonable." Defense counsel's decision not to call an expert in this case resulted, in the Commonwealth's formulation, from counsel's concern that, if he called an expert in childhood memory, that witness likely would be required to concede that Johana' s memory might, in fact, be entirely accurate. See Aff. at pp. 1-2, ,r 6 ("I was concerned that a child psychologist might have to acknowledge at trial that the alleged victim remembered the events as she now remembered them because they actually happened.").[12] The Commonwealth

--------------------------------------------

[12] At the hearing, counsel for Arce argued that trial counsel was concerned that, if he consulted an expert in childhood memory, and that expert opined that Johana's memory could, in fact, be entirely accurate, trial counsel would have to disclose that information to the Commonwealth. Because this is incorrect, Arce argues, trial counsel's decision could not have been reasonable when made. I do not, however, read trial counsel's affidavit as expressing a concern about

-26-

contends that, like the question of suggestibility at issue in Andrade, the limitations of a child's memory at issue in this case, are well within the comprehension of a lay jury.
      
There are several key differences between the situations in Andrade and in this case, however, that suggest that Andrade 's rationale does not govern my ruling in this case. First, in Andrade, the key testimony that an expert on childhood memory might have provided - that children are suggestible and that suggestive questioning can distort their memory - comports with most jurors' intuitions on the subject or, at a minimum, is not counter-intuitive. In contrast, the testimony that an expert might have given in this case -that children's memories can change over time without their being aware of it; that thinking about something over time can alter a witness's memory of it without the witness's knowledge; and, most significant, that the amount of detail recollected does not correlate with reliability (and may, in fact, negatively correlate with reliability) - are neither intuitive nor widely known. Cf. Gomes, 470 Mass. at 366 ("[R]esearch makes clear that common sense is not enough to accurately discern the reliable eyewitness identification from the unreliable, because many of the results of the research are not commonly known, and some are counterintuitive.").
      
A related significant distinction between Andrade and this case is that there is no indication in Andrade that the proposed expert testimony would have addressed a key aspect of the prosecution's theory. In this case, the prosecution understandably emphasized the level and specificity of detail that Johana recalled. Hearing testimony about the concept of trivial persuasion might have led jurors to question the force of this argument. This distinguishes this case from Andrade in which the foregone expert testimony would merely have reinforced the jury's intuitive understanding.

--------------------------------------------

disclosure. Rather, the affidavit expresses trial counsel's concern that an expert would have had to concede in testimony the possibility that Johana' s recollection was accurate.

-27-

The third significant distinction between Andrade and this case is the nature of the tactical decision made. In Andrade, defense counsel was concerned that, by giving notice months in advance of trial, she might alert the prosecution that it was at the heart of her defense and, in so doing, leading them to prepare to counter it. See Andrade, 98 Mass. App. Ct. at 399. In this case, there was no such issue. Rather, defense counsel's concern was that an expert witness in child memory might concede that children can accurately recall events even years later. It appears that defense counsel's concern in this case was that this single concession might outweigh anything else the expert could say. Defense counsel, however, could not properly weigh this concern as he did not consult an expert in childhood memory, as he had been advised by Dr. Thomas to do. Nor does defense counsel aver, as did counsel in Andrade, that he educated himself by reading articles on the subject or taking other steps to determine what an expert on childhood memory might say in testimony. Thus, unlike the tactical decision in Andrade, defense counsel's decision in this case appears to have been made nearly blind, without a thoughtful evaluation of the potential benefits and costs.
      
The distinctions between this case and Aguilar III render it significantly less persuasive as authority for the Commonwealth's position than Andrade. Notably, in Aguiar, two adult victims accused the defendant of having assaulted them sexually when they were young children. See 92 Mass. App. Ct. 1126 at *l. See also Commonwealth v. Aguiar, 78 Mass. App. Ct. 193, 194-197 (2010) (Aguiar I). That two women accused the defendant of having abused them sexually when they were children renders it significantly less likely that each allegation could have been the product of a false memory. More fundamental, the defense in Aguiar was that the women and their "families conspired to manufacture the abuse allegations as part of an extended familial dispute concerning the family business that had pitted both [victims'] ... parents against

-28-

the defendant and his wife." 92 Mass. App. Ct 1126 at *1. That the defense in Aguiar was that the accusers had fabricated the allegations renders issues of the fallibility of memory far less central than in this case, in which failure of memory was at the heart of the defense.
      
Moreover, the expert testimony that Aguiar presented in support of his (second) motion for new trial appears to have been far less convincing than Dr. Price's testimony in this case. The defense expert in Aguiar conceded that "[t]he average juror has extensive personal experience of the fallibility of memory simply by achieving the age at which one can serve on a jury." Id. at *2 (parentheses in original). This contrasts with the three key aspects of memory that Dr. Price emphasized either are not intuitive or are, in fact, counter-intuitive: that children may not be aware of changes in their memory; that thinking about something over time can alter the memory without the person's knowledge; and the trivial persuasion effect. Dr. Price testified convincingly that these aspects of childhood memory are generally unfamiliar to those outside her field. Thus, her testimony would not merely reinforce what jurors already know, as the expert in Aguiar III conceded that his testimony would have.

II. THE FAILURE To IMPEACH JOHANA'S MOTHER REGARDING THE TIMING OF HER WITHDRAWAL OF COOPERATION WITH THE INVESTIGATION

In light ofmy resolution of the first issue, I need not address Arce's subsidiary arguments: that his counsel was ineffective in not impeaching Johana's mother with respect to the timing of her withdrawal of cooperation with the investigation and in eliciting from a responding officer, on cross-examination, testimony that Arce had attempted to flee after the police were called in connection with Johanna's disclosure. Were I to address these issues, I would conclude that, standing alone or in combination with each other, they would not warrant a new trial. That said, taken in conjunction with counsel's failure to call - or even consult with- an expert in childhood memory, neither of these failures does anything to dispel my" serious

-29-

doubt whether the jury verdict would have been the same had the defense been presented." Millien, 474 Mass. at 432.

Combined with defense counsel's central theme, that common sense compelled the conclusion that Johana's memory was unreliable, was a second strand - that the police investigation of the case was insufficient. As a result, counsel argued, the jury were not presented with the type of corroborating evidence that might have been expected had a full investigation been conducted. See generally, Commonwealth v. Bowden, 379 Mass. 472 (1980).
      
To rebut that defense, the prosecutor asked Johana's mother when she had notified police that she was withdrawing her daughter's cooperation with the investigation. Johana's mother testified on direct examination that, at a meeting with Detective Mercado, she had notified him that she did not wish for her daughter to be involved further. Johana's mother did not recall when that meeting occurred. See Tr. VII, 22: 14-19. When Detective Mercado testified, he recalled that his meeting with Johana's mother occurred in May 2008. See Tr. VI, 109: 25 - 110:6. This suggested that the meeting was days after Arce's arrest for disorderly conduct. Although he had a copy of the Victim/Witness Statement Report prepared at the meeting and dated September 18, 2008 (Exhibit 7), defense counsel did not seek either to clarify the issue with the detective or impeach him regarding his recollection.[13] Thus, Arce maintains, the jury were left with the misimpression that Johana's mother had notified the Lowell Police Department within days of Johana's disclosure that she would not participate further in the investigation. This, in turn, blunted the force of his counsel's argument that the police investigation was inadequate and, thus, had not produced evidence sufficient for conviction.

--------------------------------------------

[13] In his affidavit, trial counsel submitted that he could not "recall a specific reason for failing to establish that fact [the date of the meeting between Johana's mother and Detective Mercado] at trial." Aff. at p. 3, '¶ 10.

-30-

Assuming for the sake of analysis that the police were justified in halting the investigation after Johana' s mother indicated that she would no longer cooperate, the issue is, as the Commonwealth argues, a peripheral one. It is significant in this context that the prosecutor did not even address the issue of deficiencies in the investigation - much less any reasons for them, such as the timing of the withdrawal of cooperation - in her closing. Were this the sole purported basis for the ineffective assistance claim, it would fail. It certainly would have made sense for defense counsel to clarify that the withdrawal of cooperation came months, not days, after Arce's arrest, but it does not amount to conduct "falling measurably below th[at] which might be expected from an ordinarily fallible lawyer "Saferian, 366 Mass. at 96.

III. COUNSEL'S ELICITING ON CROSS-EXAMINATION OF TESTIMONY THAT ARCE ATTEMPTED TO FLEE FROM THE POLICE

Similarly, defense counsel's cross-examination of Lowell Police Officer David Geoffrey, who responded to the scene after police were called, though unfortunate in one respect, does not, standing alone, amount to ineffective assistance of counsel. Arce notes, in this context, that his counsel asked Geoffrey, "[d]id you observe Mr. Arce try to flee the scene?" Tr. VI, 96: 10-11. Geoffrey responded,

I did. He was running around the whole street and -

Tr. VI, 96: 12-13. Arce contends that it was ineffective of his trial counsel to elicit this potentially inculpatory information from Geoffrey. He notes that, in his report, Geoffrey recorded that Arce had "started to run away" after he was confronted by Johana's grandmother and that "neighbors . . . prevented the defendant from leaving the area until police arrived." Ex. 8.
      
The Commonwealth responds that, as trial counsel noted in his affidavit, Geoffrey had testified that Arce was "'running around all over the place' . . . waving [his] arms and screaming

-31-

that he had done nothing wrong." Aff. at p. 2, ¶ 9. Thus, it was not unreasonable, the Commonwealth suggests, for trial counsel to anticipate that Geoffrey would testify at trial consistently with his testimony at the hearing on the motion to suppress. This argument is not terribly persuasive, however, in light of the information about Arce's alleged flight that features prominently in Geoffrey's report. See Exhibit 8. The Commonwealth further contends that trial counsel minimized the damage with subsequent questions to Geoffrey. Again, the contention is unpersuasive as, after conceding that he did not have to chase Arce, Geoffrey responded to another question by saying, "[h]e was being prevented from leaving, yeah." Tr. VI, 96: 23.
      
Although this line of questioning was a misstep, it does not, standing alone, rise to the level of conduct "falling measurably below th[at] which might be expected from an ordinarily fallible lawyer "Saferian, 366 Mass. at 96. That said, perhaps somewhat more than counsel's failure to clarify the date of the meeting between Johana's mother and Detective Mercado, trial counsel's eliciting of inculpatory information on cross-examination bolsters the concern that the verdict might have been different had trial counsel called an expert on childhood memory.

CONCLUSION AND ORDER

In ruling on the defendant's Motion for New Trial, I am mindful that judges should not lightly set aside a jury's verdict. See Wheeler, 52 Mass. App. Ct. at 635-636 ("Judges are to apply the standard set forth in rule. 30(b) rigorously and should only grant such a motion if the defendant comes forward with a credible reason which outweighs the risk of prejudice to the Commonwealth."), citing, inter alia, Fanelli, 412 Mass. at 504. I am also cognizant that a jury heard the evidence in this case and concluded beyond a reasonable doubt that Arce raped Johana. In considering whether justice was done, a court does not substitute its evaluation of the evidence

-32-

for the jury's. This would be both legally unsound and actually impossible. Rather, in assessing whether justice was done, a judge is asked to assess whether trial counsel's conduct of the trial fell "measurably below th[at] which might be expected from an ordinarily fallible lawyer-and, if that is found, . . . whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." Saferian, 366 Mass. at 96.

Having  reviewed  all the evidence,  I conclude  that, in this case,  in which the core of the defense was that Johana's memory was unreliable and in which the Commonwealth emphasized in its theory  of the case the extensive  detail she recalled, trial counsel's  decision  not to call - or even consult - an expert in child memory was both unjustifiable and likely deprived Arce of "a substantial ground of defence." Id Put simply, a jury that heard that there was scientific support for the propositions that: (1) the ability to encode and store memories varies with age - with younger children less able than older persons to do so effectively; (2) memories do, in fact, change over time without our awareness of that change, and (3) the level of detail recalled does not correlate with reliability of the memory might well have been more receptive - and even accepted - trial counsel's defense, which, as it was, rested only on a bare appeal to common sense.
      
No one can say for certain what might have happened had trial counsel called an expert in childhood memory or, for that matter, what might happen at a retrial if counsel calls such an expert. Arce, however, has met his burden of establishing that better work by his trial counsel might well have produced a different outcome. I am thus required to order a new trial. The Motion for New Trial is therefore ALLOWED.

/s/David A. Deakin 
Associate Justice

May 26, 2022